(May 22, 2007)

■ FRESH DEL MONTE PRODUCE N.V. et al., Plaintiffs, and IAT GROUP, INC., Respondent, v EASTBROOK CARIBE A.V.V. et al., Appellants. [836 NYS2d 160]—

Judgment, Supreme Court, New York County (Charles E. Ramos, J.), entered April 20, 2005, insofar as appealed from, awarding plaintiff IAT Group, Inc. (IAT) the sum of $9.5 million on its first cause of action against Eastbrook Caribe A.V.V., Eastbrook, Inc. and Eastbrook Limited (collectively, Eastbrook) for breach of contract, unanimously reversed, on the law, with costs, the judgment vacated and the matter remanded for a new trial before a different Justice on the issue of damages.

This action arises out of the settlement of a prior action, commenced in 1996, relating to efforts of Grupo Empresarial Agricola Mexicano S.A. de C.V. (GEAM) to sell its majority interest in Fresh Del Monte Produce N.V. (FDMP) to IAT. After GEAM and FDMP sued Eastbrook in Supreme Court, New York County in August 1996, Eastbrook counterclaimed and named IAT and others as counterclaim defendants. Among the matters at issue in the prior action were the adequacy of the price IAT was to pay for FDMP and the extent of Eastbrook's ownership interest in FDMP through another entity, Trumpet Vine Investments N.V. (Trumpet Vine). However, the action was settled, with FDMP paying $4.6 million to Trumpet Vine to redeem its minority interest in FDMP and GEAM paying $9.5 million to Eastbrook to settle Eastbrook's ownership and control claims. On December 20, 1996, IAT acquired all the stock of FDMP. That same day, as provided in the settlement agreement, the parties exchanged mutual releases, including one signed by Eastbrook in favor of FDMP, IAT and GEAM containing an indemnification clause. This appeal turns on the proper interpretation of that clause.

The indemnity clause provides as follows: "Indemnification: . . . Releasor shall hold harmless and indemnify each of the Releasees from and against, and shall compensate and reimburse each of the Releasees for, any loss, damage, injury, decline in value, lost opportunity, liability, claim, demand, settlement,

judgment, award, fine, penalty, tax, fee (including reasonable attorneys' fees), charge, cost or expense of any nature ('Damages') which is suffered or incurred by any of the Releasees or to which any of the Releasees may otherwise become subject . . . and which arise from or as a result of, or are connected with, the assertion or purported assertion of any of the Released Claims by the Releasor . . . ." The liability of Eastbrook under this provision was capped at $9.5 million, the amount it received in the settlement. On November 13, 2002, Eastbrook filed a summons with notice against FDMP and IAT, among others, seeking damages and equitable relief for various causes of action, including fraud, breach of fiduciary duty and rescission of the 1996 settlement agreement. On November 21, 2002, Heather Jones, a securities analyst, issued a report downgrading the stock of FDMP (the Jones report). The Jones report, which was based in part on the summons, stated that the summons "alleges securities fraud, the unauthorized sale of stock, civil theft, as well as other charges . . . related to the 1996 sale of Fresh Del Monte to the IAT Group," and that Eastbrook was seeking rescission of the settlement. In addition to opining that the allegations were "very serious" and expressing a preference for "stay[ing] on the sidelines until the issue is resolved," the Jones report stated that the possibility that other lawsuits could follow was "[o]f potentially greater concern," and expressed the analyst's "concern" regarding business "fundamentals," citing adverse developments in banana pricing and in the premium pineapple business.

Eastbrook did not serve and file its complaint until April 14, 2003, after FDMP and IAT commenced this action on March 19, 2003, alleging in its complaint, consistent with the summons, that IAT had fraudulently induced Eastbrook to enter into the 1996 settlement. FDMP and IAT moved to dismiss on the ground that all of Eastbrook's causes of action related to the 1996 lawsuit and, notwithstanding Eastbrook's claim of fraudulent inducement, were barred by the release. The IAS court granted the motion and this Court affirmed (11 AD3d 296 [2004], *lv denied in part and dismissed in part* 4 NY3d 844 [2005]).

With respect to FDMP's and IAT's complaint, only the first cause of action is relevant to this appeal. Therein, FDMP and IAT alleged that Eastbrook's filing of the summons violated the 1996 settlement agreement by reasserting released claims, and that Eastbrook is therefore liable under the indemnification clause in the full amount provided, $9.5 million. In November 2004, the IAS court conducted a six-day nonjury trial on dam-

ages on the first cause of action even though motions for summary judgment were pending (with Eastbrook seeking dismissal of the remaining claims against it and IAT seeking partial summary judgment as to liability on the first cause of action).

Evidence adduced at the trial established that on November 20, 2002, the day before the Jones report was issued, FDMP's stock closed on the New York Stock Exchange at $26.20. On November 21, 2002, following the report's issuance, FDMP closed at $23.41, down $2.79 or 10.6% from the previous day's close. The next day, FDMP closed at $22.10. By December 13, 2002, the price of FDMP had dropped a total of $7.45 per share. By July 2003, however, FDMP was trading above the pre-Jones report price level. Thereafter, and continuing through trial, the price of FDMP remained roughly at or above the pre-Jones report price level. In the period from the issuance of the Jones report to the trial, IAT sold only a small fraction (some 292,777 shares) of the roughly 27 million shares of FDMP (about 43% of the outstanding shares) it owned.

Following the trial on damages, Supreme Court ruled that by filing the summons with notice, Eastbrook had reasserted released claims in breach of the settlement agreement, and, accordingly, granted IAT's motion for summary judgment as to liability on the first cause of action and denied Eastbrook's motion for summary judgment on the remaining causes of action. With respect to damages, Supreme Court ruled that the phrase "decline in value" in the indemnification clause does not require that any losses actually be sustained, and that Eastbrook's assertion of released claims in violation of the settlement agreement had caused a decline in value of the price of FDMP of at least $.56 per share, an amount sufficient to exhaust the overall cap on Eastbrook's liability of $9.5 million given the number of FDMP shares owned by IAT.

We agree with Eastbrook that the phrase "decline in value" in the indemnity clause does not encompass transitory declines in the price of FDMP's stock. "Although the words might 'seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view' " (*Hooper Assoc. v AGS Computers*, 74 NY2d 487, 491 [1989], quoting *Robertson v Ongley Elec. Co.*, 146 NY 20, 23 [1895]). The clause in which this phrase appears is entitled "Indemnification." The term "indemnify" means: "To restore the victim of a loss, in whole or in part, by payment, repair, or replacement. To save harmless; to secure against loss or damage; to give security for the reimbursement of a person in case of an anticipated loss falling upon him. To make good; to

compensate; to make reimbursement to one of a loss already incurred by him" (Black's Law Dictionary 769 [6th ed 1990]).

All of the contingencies for which Eastbrook is obligated to "compensate and reimburse" IAT are defined by the indemnification clause to be examples of "damages." The first three contingencies, "loss, damage, injury," unambiguously entail actual or realized loss or harm. Interpreting the immediately following phrase, "decline in value," to exclude unrealized losses attendant to temporary declines in price is consonant with the canon of construction that "the meaning of a word in a series of words is determined by the company it keeps" (*242-44 E. 77th St., LLC v Greater N.Y. Mut. Ins. Co.*, 31 AD3d 100, 103-104 [2006] [internal quotation marks and citation omitted]).[1]

Another relevant consideration is that the phrase at issue appears in an indemnification clause. "When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed" (*Hooper Assoc.*, 74 NY2d at 491 [citations omitted]; *see also Levine v Shell Oil Co.*, 28 NY2d 205, 211 [1971] ["a rule has evolved under which courts have carefully scrutinized these agreements for an expression of an intent to indemnify and for some indication of the scope of that indemnification"]). Thus, the intention to indemnify must be "unmistakably clear from the language of the promise" (*Hooper Assoc.*, 74 NY2d at 492). Here, the intention to indemnify for unrealized losses due to transitory declines in price is far from "unmistakably clear" (*id.*; *see also Hartz Consumer Group Inc. v JWC Hartz Holdings Inc.*, NYLJ, Nov. 18, 2005, at 21, col 1, at 22, col 1 [Sup Ct, NY County] ["Not only the intent to indemnify, but also the scope of indemnification, must be 'unmistakably clear from the language of the promise' or 'clearly implied from the language and purpose of the entire agreement' " (quoting *Hooper Assoc.*, 74 NY2d at 491-492)]).

Compelling support for Eastbrook's position is provided by the canon of construction counseling against interpreting a contract so as to produce unreasonable results (*see Fleischman v Furgueson*, 223 NY 235, 241 [1918] ["It is a well-established canon of interpretation that in seeking for the intent of the par-

---

1. Two of the other contingencies, a "claim" and a "demand," do not unambiguously entail actual or realized loss or harm. Nonetheless, in light of their linguistic companions—and, as discussed below, both because they appear in an indemnification clause and to avoid making the contract unreasonable—these terms also must be construed to encompass only actual or realized loss or harm.

ties the fact that a construction contended for would make the contract unreasonable may be properly taken into consideration"]). If the phrase "decline in value" were construed to encompass such unrealized losses, little acuity is needed to see the unreasonableness of the results that well could ensue. As Eastbrook points out, suppose that FDMP's stock price had declined by two dollars on the morning of November 21, 2002 following the release of the Jones report, but then rose two dollars an hour or a day later. Provided only that the initial two-dollar drop was caused by the Jones report (i.e., it "ar[o]se from or as a result of" or was "connected with" the assertion of a released claim), Eastbrook would be required to "compensate and reimburse" IAT for the full two-dollar drop even though IAT suffered no damages. Such a "strange, unnatural and unreasonable reading of the contract" (*Fleischman*, 223 NY at 241) should be avoided (*see id.* ["A court will endeavor to give the construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other"]; *cf. Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430, 438 [1994] ["It is highly unlikely that two sophisticated business entities, each represented by counsel, would have agreed to such a harshly uneven allocation of economic power under the Agreement"]). IAT's only response is that the necessary causal link between the assertion of released claims and the occurrence of such an "intra-day" decline in the price of FDMP would be impossible to establish. Even if that were so—IAT provides no reason so to conclude—IAT does not and cannot argue that it would be impossible to establish such a link over slightly longer periods of time. The result for which IAT contends—the windfall award of "damages" where none have been sustained—is unreasonable regardless of whether the price decline is reversed after a day, a week or a month.

IAT's more substantial contention is based on the canon of interpretation that where "different words [are used] in a series, the words should not be construed as mere redundancies" (*Matter of SIN, Inc. v Department of Fin. of City of N.Y.*, 126 AD2d 339, 343 [1987], *affd* 71 NY2d 616 [1988] [internal quotation marks and citation omitted]; *see also Carter-Wallace, Inc. v Tambrands Inc.*, 295 AD2d 176, 177 [2002] [interpretation which "would render (a) subdivision . . . of the indemnity clause meaningless . . . is not a reasonable interpretation of the agreement"]). On the particular facts of this case, however, this canon of construction is not a reliable guide to the parties' intent. As Eastbrook stresses, even if the terms "loss," "damage" and "injury," the first of the listed examples of "dam-

ages," are not synonyms, they have overlapping meanings. Thus, the text of the indemnification clause is at odds with the notion that the parties intended each of the terms in the series of indemnification contingencies to have a distinct meaning.[2] In any event, we will not give free rein to this canon when doing so would vitiate the other canons discussed above.

Nor is IAT persuasive in pointing to a provision in section four of the settlement agreement relating to the representation and warranty by Eastbrook and Trumpet Vine that the latter owned 3.5 million shares of FDMP stock free and clear of any adverse claims, liens or other rights. Pursuant to this provision, in the event of a breach of this representation and warranty, GEAM and FDMP's "sole remedy shall be a claim for damages for losses actually sustained." According to IAT, this provision makes clear that "the parties knew precisely how to specify a realized loss requirement when they so chose." That may be, but it does not follow from the use of this language in the settlement agreement that the parties to the Eastbrook release intended that Eastbrook indemnify the releasees for losses *not* actually sustained. As Eastbrook points out, there is another and perfectly plausible explanation for the language in section four. That is, it was drafted not to exclude a claim for damages for losses not actually sustained, but to exclude other standard contract remedies for a failure to deliver shares free and clear of any lien, such as rescission of the agreement.[3]

Finally, we reject Eastbrook's contention that IAT failed to prove a prima facie case of damages because its evidence of damages focused exclusively on the price of FDMP's publicly traded stock whereas IAT owned only unregistered, restricted FDMP stock. To be sure, there was no evidentiary basis for Supreme Court's assumption that the price of the unregistered, restricted stock would move in "lock step" with the publicly traded stock. To make out a prima facie case, however, IAT was not required to establish such a precise relationship between the price of its unregistered, restricted stock and the publicly traded stock (*see Hirschfeld v IC Sec.*, 132 AD2d 332, 336-337

---

**2.** Eastbrook argues that a "decline in value" can be "of a permanent and irreversible, rather than temporary and reversible, nature." If the term "decline in value" were construed to cover unrealized losses that are "permanent and irreversible," it would receive a distinct meaning. IAT, of course, does not advance such a construction of the term. Whether Eastbrook does is not clear, but we need not attempt to resolve the issue.

**3.** Although IAT points to an earlier draft of section four in which the sole remedy language was omitted, the parties do not otherwise contend that there is any extrinsic evidence bearing on the meaning of the phrase "decline in value." Indeed, the parties concede that there is no such evidence.

[1987], *lv dismissed* 72 NY2d 841 [1988] ["While damages may not be determined by mere speculation or guess, evidence that, as a matter of just and reasonable inference, shows their existence and the extent thereof will suffice, even though the result is only an approximation" (internal quotation marks and citation omitted)]). Similarly, although we agree that the phrase "decline in value" excluded unrealized losses attendant to transient declines in price, we also reject Eastbrook's contention that in relying on the Jones report IAT failed to prove that the assertion of released claims caused it to suffer any losses.

Although we have every confidence that Supreme Court would preside fairly and impartially over a new trial on the issue of damages, Eastbrook raises a reasonable concern about the appearance of impartiality and we accordingly direct that this matter be reassigned to another Justice. Concur—Saxe, J.P., Nardelli, Sweeny, McGuire and Malone, JJ.